# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

STEPHANIE SIMPKINS,

     Plaintiff,

                                        Civil Action 2:12-cv-274

    v.                                  Judge Gregory L. Frost

                                        Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL SECURITY,

     Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Stephanie Simpkins, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 17), Plaintiff's Reply (ECF No. 19), and the administrative record (ECF No. 5).  For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff filed her applications for benefits on October 6, 2007, alleging that she has been disabled since August 29, 2007, at age 22.  (R. at 127-29, 130-36.)  Plaintiff alleges disability as a result of bipolar disorder and borderline personalty disorder.  (R. at 183.)  Plaintiff's applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.

Administrative Law Judge Joseph Essmyer ("ALJ") held a video hearing on July 21, 2010, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 27-38.)  Vickie Colenburg, a vocational expert ("VE"), also appeared and testified at the hearing.[1]  (R. at 39-43.)  On July 28, 2010, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 10-19.)  On February 10, 2012, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-5.)  Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified that she had completed high school and did not take any special education classes.  At the time of the hearing, Plaintiff lived with her father.  She testified that she had previously lived with her fiancé.  She represented that she needed help with the laundry, dishes, and cooking because she feels as though she cannot do these chores.  (R. at 28.)  She has a driver's license, but does not drive because she does not have a car.  (R. at 29.)  In addition to

---

[1]The transcript to the ALJ hearing and the decision note that Daniel W. Hamill, Ph.D. appeared and testified at the hearing.  (R. at 10, 27.)  Review of the hearing transcript, however, reveals that he did not testify.

her father and fiancé, Plaintiff regularly socializes with her friend.  She says she tries to read her Bible, but that she has difficulty concentrating.

Plaintiff testified that she had performed a number of jobs, most of which consisted of cashiering and clerking.  (R. at 27.)  She last worked at Shell in July 2008.  She testified that she quit that job because she did not want to get out of bed due to her depression.  (R. at 28.)  Plaintiff said that when employed, she feels like her bosses and co-workers talk about her.  (R. at 30.)  Plaintiff testified that she has not been fired from a job and that she quits before she gets fired.  (*Id.*)  Plaintiff further testified that she sometimes has problems remembering things and that she would probably not follow a list because she does not like being told what to do.  (*Id.*)  She also indicated that she sometimes had trouble keeping up with the pace of her work.

When asked to explain why she could not work, Plaintiff read a statement she had written before the hearing.  (R. at 31.)  In this statement, Plaintiff noted that she has been diagnosed with bipolar disorder and borderline personality disorder, and that her latest doctor has opined that she is schizo-affective.  Plaintiff represented that she panics around a lot of people and feels nervous and anxious when she first meets someone.  She stated that she experiences visual and auditory hallucinations daily.  (R. at 32.)  Plaintiff further stated that she typically feels depressed and wants to stay in bed.  She estimated that she had six-to-seven psychiatric admissions for suicide attempts, averaging three-to four days each.  (R. at 31, 38.)  Plaintiff indicated that she experiences lower back pain, but not on a regular basis.  (R. at 34.)  At the time of the hearing, in addition to her psychiatric medications, Plaintiff was taking hydrocodone, Meloxicm, and Ultrams for her back pain.  (R. at 38.)  Plaintiff testified that her medications cause memory loss, diarrhea and weight gain.  (R. at 31, 38.)

**B.      Vocational Expert Testimony**

The VE testified that Plaintiff had past relevant work history as a cashier.  (R. at 39.)  She indicated that although the DOT classifies a cashiers position as light and unskilled, Plaintiff performed it at the medium-heavy level.  (*Id.*)

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity to the VE.  The ALJ first asked the VE to assume that Plaintiff could perform the full range of exertional work with the following non-exertional limitations: limited to performing simple one-, two-, or three-step tasks; can attend and concentrate for extended periods when completing simple tasks; can have only occasional contact with supervisors, co-workers, and "incidental" contact with the general public; no forced paced or quota requirements; cannot be required to perform assembly line work; and can respond appropriately to simple, routine work environment, as well as to simple, routine changes of that environment.  (R. at 40, 41.)  The VE testified that based upon these limitations, Plaintiff could not perform her past relevant work. (*Id.*)  According to the VE, Plaintiff could perform other medium and light, unskilled jobs that would be available at the state and national levels, such as a laundry worker, mail clerk, hospital cleaner, kitchen helper, and dishwasher.  (R. at 41-42.)  The VE further testified that if Plaintiff were restricted to sedentary work, most of the jobs she had identified would be would significantly limited.  (R. at 42.)

Upon cross-examination, the VE testified if Plaintiff would be absent at least two days a month or off task ten percent of the time on a regular basis, she would not be able to maintain competitive employment.  (R. at 43).

### III.      MEDICAL RECORDS

4

**A.      Before the August 29, 2007 Alleged Onset Date**

Plaintiff presented to the Ohio State University Medical Center Hospital in October 2002 with complaints of auditory hallucinations and inability to sleep.  (R. at 288-93.)  Plaintiff was admitted on October 22, 2002, and discharged the next day.  She attended school both of these days.  (R. at 290.)  The school confirmed that Plaintiff was compliant and not a behavioral problem.  Plaintiff performed at a high school level in reading, spelling, and arithmetic on the Wide-Range Achievement test.  A mental status examination revealed that Plaintiff was not hallucinating at the time of her admission even though she "mentioned" hallucinations when she was evaluated.  It was noted that Plaintiff appeared disheveled and depressed.  She was diagnosed with Bipolar and discharged with adjusted medications.  (R. at 291.)  The attending physician assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 20-25 upon admission 40-50 upon discharge.[2]  (*Id.*)

Plaintiff was admitted to Twin Valley Behavioral Healthcare for five days in December 2004 with a suicidal plan.  (R. at 297-306.)  Her intake history reveals that she had first met with her outpatient psychiatrist, Dr. Larry Pfahler, December 17, 2004.  During this appointment, Plaintiff endorsed suicidal ideation with a specific plan to hang herself on December 31, 2004, to

---

[2]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).  A GAF score of 21 to 30 indicates an individual that is "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriate, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home or friends)" DSM-IV-TR at 34.  A GAF score of 41-50 indicates "severe symptoms . . . or  serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job) . . . ." (*Id.*)

retaliate against her grandfather because they do not get along.  Plaintiff reported stopping her medication for financial reasons.  She acknowledged, however, poor compliance with medications available to her because at times she believed she did not need the medications.  (R. at 298.)  Plaintiff also reported numerous prior suicide attempts with medication overdoses for which she did seek or receive medical treatments.  Plaintiff further indicated that her last hospitalization was in October 2002, that she had not seen a psychiatrist since April 2004, and that she had not seen a counselor since 2003.  (R. at 297.)  Plaintiff indicated that she had chronic difficulty in getting along with others.  She reported having eight different jobs, primarily in the fast food/retail sector, and leaving those jobs because of her low frustration tolerance and inability to get along with others.  (R. at 299.)  Plaintiff reported that her suicidal ideation quickly waned upon her admission.  She indicated that she felt fearful of other patients in the hospital and wanted to be released.  (R. at 304.)  She noted that she was pleased to learn that so many people cared about her.  (*Id*.)  Dr. Pfahler described Plaintiff as alert, oriented, cooperative, and calm and as having a euthymic mood and clear, coherent speech.  He noted that Plaintiff met some criteria for bipolar disorder and that she had a previous diagnosis of bipolar. Given that she met all nine of the criteria for borderline personality disorder, however, he found this to be her primary diagnosis. (R. at 305.)  During her hospital visit, Plaintiff quickly stabilized upon restarting the medications she identified as most helpful to her in the past. Within his assessment, the psychiatrist noted that after further visitation with her family and contact with friends, Plaintiff had appropriate housing options in place, a desire to return to work, and a desire to continue taking her medications and follow up with outpatient providers.

In March 2005, Plaintiff was admitted to Grady Hospital after attempting suicide by overdosing on Vicodin and Seroquel.  (R. at 417-91.)  Plaintiff reported impulsively attempting suicide due to her anger with her parents over their disapproval of her boyfriend.  Plaintiff also reported depressed mood, mood swings, visual and auditory hallucinations, and sleep disturbance.  (R. at 420.)  Upon conducting a mental status exam, attending physician Dr. Patel described Plaintiff as pleasant, cooperative, stable, goal and future oriented, and as having a euthymic mood and appropriate affect.  Dr. Patel noted that Plaintiff tolerated her medication regimen well without any adverse effects.

Plaintiff presented to the hospital on June 20, 2005, requesting admission and treatment for suicidal ideation, depression, and auditory and visual hallucinations.  (R. at 308-416.)  A nurse completing an assessment form at intake noted that Plaintiff alleged visual and auditory hallucinations and suicidal ideation.  (R. at 335.)  The nurse described Plaintiff as calm and well-groomed, and having good eye contact.  (*Id*.)  The nurse also indicated that Plaintiff had normal, appropriate, and clear speech.  Cognitive functioning testing revealed that Plaintiff was able to remember three objects, spell "world" backwards, and count backwards from 100 by ten.  (*Id*.)  Plaintiff reported that her recent stressors included the death of a friend, relationship issues, and the denial of her application for social security income.  (R. at 380.)  The intake physician described Plaintiff's mental status as "awake and appropriate" with a depressed mood and flat affect.  (R. at 309.)  Plaintiff reported seeing dead people hanging.  (R. at 316.)   The attending physician, Dr. Patel, noted that based upon a conversation with Plaintiff's outpatient therapist, Plaintiff was confronted about her alleged hallucinations due to concerns that she was engaging

in attention-seeking behavior.[3]  (R. at 317.)  Plaintiff tolerated her medication regimen well and did not experience any adverse side effects.  Dr. Patel indicated that during her hospital stay, Plaintiff's mood and sleep had improved.  She described Plaintiff as "stable and improved" and "goal and future oriented."  Upon discharge, Dr. Patel listed Plaintiff's diagnosis as bipolar disorder, depressed, severe with psychosis.  (R. at 316-18.)

Plaintiff presented to the emergency room at Medical College of Ohio on August 28, 2007, complaining of depression, anxiety, and suicidal ideation.  (R. at 493-98.)  Plaintiff indicated that she had stopped taking medications a year earlier.  She endorsed suicidal ideation and reported a history of medication overdoses, prompting her involuntary commitment to Rescue Mental Health Services.  (R. at 506.)  At Rescue Mental Health Services, Plaintiff denied her prior allegations of being suicidal, instead alleging that she went to the emergency room for a quick referral to a psychiatrist.  (R. at 506.)  Plaintiff added that she wanted to go home and to go to work in the morning.  (R. at 511.)  The therapist assessing Plaintiff described her as oriented with an appropriate affect and euthymic mood.  (R. at 507.)  The diagnostic impressions included bipolar, mild in severity, and borderline personality disorder.  (R. at 510.)  Plaintiff was discharged without being provided any medications and was encouraged to seek mental health treatment.  (R. at 517.)

**A.** **After the August 29, 2007 Alleged Onset Date**

---

[3]Plaintiff's therapist, Paula Clay, also reported that Plaintiff had shared with her that her sister had recently married and become pregnant and that her other sisters were doing well. Plaintiff's therapist speculated that Plaintiff may have wanted attention.  (R. at 371.)  Plaintiff also expressed her desire to discontinue taking medication and to get pregnant.  (R. at 371, 388.)

Rescue Mental Health Services referred Plaintiff to Unison Behavioral Health Group. On November 6, 2007, Plaintiff underwent a diagnostic assessment. (R. at 519-26.) Plaintiff complained of hearing voices and feeling depressed every day. (R. at 519.) She indicated that she had not taken any medication since summer of 2006. (R. at 525.) Plaintiff reported feelings of isolation, decreased concentration, auditory hallucinations, and suicidal ideation. She further reported that she had been hospitalized seven or eight times for psychiatric reasons. She alleged that she had attempted suicide on other occasions, but did not go to the hospital. Plaintiff reported that she had held seventeen jobs, mostly cashier positions, in the past five years and that her attendance that these jobs was normal, but that attendance had been a problem because she does not like to get out of bed or work with other people. (R. at 520.) She added that she typically quits her jobs and that she had applied for social security income. (R. at 521, 524.) The clinician described Plaintiff as neat, clean, and oriented with clear and coherent speech. (R. at 524.) Plaintiff was diagnosed with bipolar I, most recent episode depressed severe with psychotic episodes and was assigned a GAF score of 50. (R. at 525.)

Dr. Usha Salvi evaluated Plaintiff on December 10, 2007. (R. at 542-48.) Plaintiff endorsed a history of mood swings, anger, depressed and manic episodes, inability to go anywhere alone, hallucinations, and poor self esteem. (R. at 542-43.) She reported that her last manic episode was in July 2007 and that it lasted for two weeks. Plaintiff represented that she had attempted suicide thirty times. She admitted that she makes a big deal out of small things in part to get attention. Plaintiff reported that she typically quits her cashier jobs because she is easily angered and does not like to be told what to do. She reported spending her days playing games on PlayStation, watching television, and doing chores. She admitted using marijuana,

cocaine, ecstasy, and vicodin, oxycodon, and phenergan from the street. Plaintiff added that the last time she used these drugs was in June 2007, but that she would like to still use these drugs. (R. at 544.)  Mental status examination revealed a euthymic affect, well-organized thought process, intact immediate and remote memory, and merely mildly impaired concentration.  Dr. Salvi noted that although Plaintiff described herself as depressed, her affect was euthymic.  He explained that Plaintiff displayed "[q]uite a few smiles and laughter" and also interacted with her fiancé.  Dr. Salvi diagnosed bipolar disorder I, most recent episode manic, moderate opioid use, and personality disorder not otherwise specified.  (R. at 545.)  Dr. Salvi recommended that medication and group therapy.  Because Plaintiff had expressed a desire to get pregnant, Dr. Salvi further recommended that she not get pregnant on the medications typically prescribed for bipolar disorder.  (R. at 546.)

On February 5, 2008, after review of Plaintiff's medical record, John Waddell, Ph.D., a state agency psychologist, assessed her mental condition.  (R. at 552-69.)  Dr. Waddell found Plaintiff had mild restrictions of activities of daily living, moderate restrictions in maintaining social functioning and concentration, persistence, and pace, and no episodes of decompensation of extended duration.  (R. at 562.)  In the narrative assessment, Dr. Waddell concluded that Plaintiff's allegations are not fully credible.  By way example, Dr. Waddell cited Plaintiff's alleged thirty suicide attempts and her reports of quitting jobs after a week even though the record demonstrates that she had worked as a gas station cashier for more than eight months before quitting.  He also noted that there are no functional conclusions from a treating source.  Dr. Waddell opined that Plaintiff retained the residual functional capacity to understand, remember, and carry out more than simple tasks; has reduced persistence, but can complete a

10

normal work day that does not require rapid or consistent pace; and will do better at tasks that do not require much interaction with others, but can engage in simple social interactions in a work setting.  (R. at 569.)

Plaintiff was assessed at the Central Ohio Mental Health Center on February 29, 2008. (R. at 572-82.)  Plaintiff reported that she has been receiving mental health treatment since she was sixteen or seventeen years old.  She also reported a history of several psychiatric hospitalizations for suicide attempts.  Plaintiff alleged that she was currently experiencing a visual and auditory hallucinations involving a little girl and that this hallucination is "always there."  (R. at 572.)  She identified watching basketball and movies, swimming, shooting pool, and the internet as her meaningful activities.  (R. at 573.)  Plaintiff indicated that she did not feel depressed during the assessment.  (R. at 577.)  The intake counselor noted that Plaintiff's previous history shows that she has a pattern of non-compliance with treatment recommendations.  Her previous service provider further noted Plaintiff's history of impulsive behavior and becoming involved in unhealthy relationships with peers.  Plaintiff denied mental health problems interfering with her work.  She reported, however, that she has held around twenty jobs within the last five years due to various reasons.  (R. at 580.)  The clinician diagnosed Plaintiff with bipolar I disorder, most recent episode depressed, severe with psychotic features per patient history and borderline personality disorder and assigned her a GAF score of 61.[4]  (R. at 581.)

---

[4]A GAF score of 61-70 is indicative of mild symptoms or mild difficulty in social, occupational, or school functioning.  DSM-IV-TR at 34.

Plaintiff was admitted to Memorial Hospital of Union County for two days in June 2008 due to attempted suicide by overdosing on Depakote, her psychotropic medication. (R. at 595-616.) She reported rapid mood swings, irritability, crying spells, poor sleep, and low energy. (R. at 597.) Dr. Patel adjusted Plaintiff's medication, which she tolerated without any adverse side effects. (R. at 598.) Dr. Patel described Plaintiff as cooperative and goal and future oriented. Upon discharge, Plaintiff was stable and reported euthymic mood and intact thought process without delusions, hallucinations, or suicidal ideations. (R. at 600.)

Following this hospitalization, on July 9, 2008, Plaintiff underwent a initial psychiatric evaluation at Central Ohio Mental Health Center. (R. at 628-31.) Plaintiff reported she is still having frequent mood swings, but denied side effects with the medication. Plaintiff further reported that when she is manic, she has increasesed spending, decreased sleep, pressured speech, and periods of feeling like nothing bothers her, then switching to depression where she does not get out of bed. (R. at 628, 630.) Mental status examination revealed that Plaintiff's mood was depressed, her affect was constricted, and she was cooperative with fair insight and judgment. (R. at 630.) Plaintiff identified her hobbies as bowling, shopping, movies, sports, poker, and hanging out with friends. (R. at 633.) Dr. Snyder diagnosed Plaintiff with bipolar disorder I, mixed and borderline personality disorder. (R. at 630.) The record shows that Plaintiff continued to treat with Dr. Snyder at Central Ohio Mental Health Center through June 2009. During this time, Plaintiff endorsed some mood instability, occasional suicidal ideation without intent, and stressors related to interpersonal relationships and her attempts to obtain social security benefits. (R. at 632-60.)

12

On June 3, 2008, Dr. Hoyle reviewed the file and affirmed Dr. Waddell's February 5, 2008 assessment.  Dr. Hoyle noted that Plaintiff's father had represented that she is able to follow instructions; that she spends time with her friends, goes out alone, does household chores and cooking, and completes tasks she begins; and that she handles changes in routine well, but not stress.  (R. at 594.)  Dr. Hoyle further noted that Plaintiff's father reported that she has had four or five suicide attempts rather than the thirty attempts she has reported.  Dr. Hoyle opined that the medical records in general reveal that Plaintiff's statements are of questionable credibility and that she has a tendency towards exaggeration of severity.  (*Id*.)

On August 13, 2009, Plaintiff was evaluated by Michael Saribalas, D.O., C.B.S.M., for daytime sleepiness, fatigue, and mood disorder.  (R. at 672-74.)  Dr. Saribalas noted that Plaintiff was transferring care from Dr. Snyder at Central Ohio Mental Health Center.  Plaintiff reported that she had been hospitalized in the past and that her social security disability application was pending.  Dr. Saribalas noted that Plaintiff's mood was depressed with flat affect and that her insight and judgment were fair to poor.  Dr.  Saribalas also found no loose associations or flight of ideas, no manic or hypomanic symptoms, and he reported Plaintiff was pleasant, cooperative, and a fair to poor historian.  Dr. Saribalas diagnosed bipolar affective disorder, most recent episode depressed; panic disorder with agoraphobia; and possible post traumatic stress disorder. (R. at 673.)

Plaintiff presented to the emergency room on August 25, 2009, reporting that she was having a panic attack.  (R. at 676-78.)  Laboratory testing at that time revealed that she had only taken 0.5 mg of Xanax.  Plaintiff denied any co-ingestion of other medications.  She also denied any suicidal ideations or new symptoms of depression, and indicated that she was just trying to

get rest.  (R. at 676.)  Dr. Willette, the emergency room physician, described Plaintiff as " very manipulative."  (*Id*.)

On December 17, 2009, Dr. Pfahler reported mixed symptoms due to Plaintiff's bipolar disorder including poor sleep, anger, depression, mania, and auditory and visual hallucinations. (R. at 734.)  He listed Plaintiff's medications as Lithium, Risperdal, Pristiq, Zoloft, and Wellbutrin.  (*Id*.)  In February 2010, Plaintiff reported to Dr. Pfahler that even with the change in medication, she still experienced hallucinations and suicidal thoughts.  (R. at 732.)  He diagnosed Plaintiff with schizoaffective disorder.  (*Id*.)  Two weeks later, Plaintiff reported that she was not hallucinating but that she was sleeping all day and when not in bed, she felt irritable, and her mind was overactive.  (R. at 733.)

On May 26, 2010, a Basic Medical form was completed on behalf of the Ohio Department of Job and Family Services by Plaintiff's treating physician at Lower Lights Christian Health Center.  The physician noted that Plaintiff has a long-standing mood disorder, schizoaffective disorder, that has not responded well to treatment or counseling that complicates her other conditions.  The physician further noted that Plaintiff's schizoaffective disorder causes mood swings, irritability, and interpersonal and attention issues.  (R. at 744-45.)

The file also contains the first page of a mental capacity assessment by an unknown provider who opined that Plaintiff has moderate limitations in her ability to follow work rules, maintain attention and concentration, interact with co-workers, deal with the public, maintain attendance, and respond appropriately to changes in the work setting.  (R. at 710.)  This provider further opined that Plaintiff was significantly limited in her ability to function independently, work in coordination with others, and deal with work stress.  (*Id*.)  As the ALJ pointed out in his

14

decision, this assessment is attached to treatment notes for Plaintiff's physical conditions, and it is unclear whether the opinion had been submitted by Dr. O'Brian.  (*See* R. at 711-31.)

## IV.   THE ADMINISTRATIVE DECISION

On July 28, 2010, the ALJ issued his decision.  (R. at 10-19.)  At step one of the sequential evaluation process,[5] the ALJ found that although Plaintiff worked for a few months as a cashier in 2008, she had not engaged in substantially gainful activity since August 29, 2007. (R. at 12.)  The ALJ found that Plaintiff had the severe impairments of bipolar I disorder; personality disorder, not otherwise specified; schizoaffective disorder; and obesity.  (*Id.*)  He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 13.)  The ALJ specifically considered Listings 12.03 (schizophrenic), 12.04 (mood disorder), 12.08 (personality disorder), and 12.09 (substance abuse disorder).  (R. at 13.)

---

[5] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?
2.   Does the claimant suffer from one or more severe impairments?
3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.   Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity

("RFC").  The ALJ found:

> [Plaintiff] has the residual functional capacity to perform a full range of work at all
> exertional levels but with the following nonexertional limitations: [Plaintiff] is
> limited to simple 1, 2, and 3 step tasks with only occasional contact with supervisors
> and co-workers and only incidental contact with the general public.  She can attend
> and concentrate for extended periods when performing simple tasks, respond
> appropriately to a simple work environment, and respond to simple routine changes
> in the work environment.  She is unable to perform assembly line work and cannot
> be subject to forced pace or quota requirements.

(R. at 14.)  In reaching this determination, the ALJ accorded "little" weight to the opinion

provided from the Ohio Department of Job and Family Services, explaining that it is unclear

whether the opinion had been submitted by a medical professional capable of providing such an

opinion.  (R. at 17.)  The ALJ further explained that the opinions submitted by unidentified

sources apparently relied quite heavily on the subjective report of symptoms and limitations

provided by Plaintiff, and seemed to uncritically accept as true most, if not all, of what Plaintiff

reported.  (*Id.*)  The ALJ afforded "great" weight to the opinions of reviewing psychologists,

Drs. Waddell and Hoyle.  (*Id.*)  The ALJ found that their opinions were generally consistent with

the record as a whole.  (*Id.*)  The ALJ granted additional allowances in Plaintiff's RFC to

accommodate Plaintiff's expressed fear of being around people.  (*Id.*)

The ALJ also concluded that although Plaintiff's medically determinable impairments

could reasonably be expected to cause the alleged symptoms, her statements concerning the

intensity, persistence and limiting effects of these symptoms were inconsistent with the medical

evidence as she severely minimizes her ability to perform work-related activities.  (*Id.*)  He

found her statements regarding her symptoms to be not credible to the extent they conflicted

with his RFC assessment.  (R. at 15.)

16

Relying on the VE's testimony, the ALJ determined jobs exist in significant numbers in the state and national economy that Plaintiff can perform.  (R. at 18-19.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 19.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where

17

that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"

*Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

Plaintiff advances two arguments in support of her assertion that the Court should reverse the Commissioner's decision.  First, Plaintiff asserts that the ALJ erred at step three of the sequential process with regards to his determination that her mental impairments failed to meet or equal Listing 12.04.  More specifically, Plaintiff posits that the ALJ erred in his evaluation of her difficulties with persistence and pace and her episodes of decompensation within his consideration of the paragraph B criteria.  Second, Plaintiff maintains that the ALJ's RFC determination is not supported by substantial evidence.  Within this contention of error, Plaintiff submits that the ALJ's assessment is deficient because it fails to address her inability to sustain activity.  Plaintiff further posits that the ALJ impermissibly relied on outdated assessments and his own assessments.  This Report and Recommendation addresses each of Plaintiff's arguments in turn.

### A.    Listing 12.04 (Affective Disorder)

A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he or she is disabled at step three of the sequential evaluation process.  *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 855 (6th Cir. 1986).  The claimant has the burden to prove that all of the elements are satisfied.  *King v. Sec'y of Health & Hum. Servs.*, 742 F.2d 968, 974 (6th Cir. 1984).  The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider

18

the opinion given by one or more medical or psychological consultants designated by the

Commissioner."  20 C.F.R. § 404.1526(c).  Nevertheless, "[t]he burden of providing a . . . record

. . . complete and detailed enough to enable the Secretary to make a disability determination rests

with the claimant."  *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir.

1986).  It is not sufficient to come to close to meeting the conditions of a Listing.  *See, e.g.*,

*Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where

medical evidence "almost establishes a disability" under Listing).

The Undersigned finds no error with the ALJ's determination that Plaintiff failed to meet

her burden to offer evidence demonstrating that she satisfied the conditions of Listing 12.04.

The paragraph B criteria for Listing 12.04 (affective disorder) requires at least two of the

following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 2, Listing 12.04 ¶ B.  As set forth above, Plaintiff takes issue

with the ALJ's evaluation of her difficulties with persistence and pace and her episodes of

decompensation.

Substantial evidence supports the ALJ's determination that Plaintiff has only moderate

difficulties with regard to concentration, persistence, or pace.  Drs. Waddell and Hoyle both

opined that Plaintiff had only moderate limitations with regard to concentration, persistence or

pace.  (R. at 566-69, 594.)  In an effort to carry her burden to establish that she is more limited,

she references Dr. Pfahler's treatment notes from three of her visits.  (Pl.'s Statement of Errors 13, ECF No. 13 (citing R. at 732-34).)  These treatment records reflect Dr. Pfahler's notations of Plaintiff's self-reported symptoms during these three visits.  Dr. Pfahler makes no mention of persistence or pace issues.  Nor does Dr. Pfahler, or any other medical source, offer countervailing opinions regarding Plaintiff's pace and persistence limitations.  Notably, the ALJ considered and accommodated Plaintiff's limitations relating to pace and persistence that he found to be credible in determining her RFC.  Specifically, the ALJ limited Plaintiff to simple tasks with only simple routine changes and further restricted her from performing assembly line work or jobs that may subject her to forced pace or quota requirements.  (R. at 14.)  In light of the foregoing, the Undersigned cannot conclude that the ALJ erred in concluding that Plaintiff had failed to establish that her mental impairments met or equaled Listing 12.04 or that he otherwise erred in his consideration and accommodation of her limitations relating to pace and persistence.  Because Plaintiff must satisfy two of the four paragraph B criteria to meet or equal the listing and she does not challenge the ALJ's determination with regard to the first two categories, this finding is dispositive with regard to Plaintiff's first contention of error.

Regardless, the Undersigned finds that Plaintiff's first contention of error lacks merit for the independent reason that substantial evidence supports the ALJ's determination that Plaintiff experienced no episodes of decompensation of extended duration.  Plaintiff correctly points out that the term "repeated episodes of decompensation, each of extended duration" as it is utilized in Listing 12.04 "means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  She also properly notes that the Commissioner must utilize his or her judgment where the record establishes that the claimant "experienced more frequent episodes

20

of shorter duration" to determine whether "the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence."  20 C.F.R Pt. 404, Subpt. P, § 12.00(C)(4).

The record evidence Plaintiff relies upon fails to support her assertion that she experienced episodes of either the requisite frequency or duration.  Most of the instances Plaintiff references occurred prior to her alleged onset of disability and spanned several years. (*See* Pl.'s Statement of Errors 14, ECF No. 13 (citing R. at 291–two-day admission in October 2002; R. at 297–five-day admission in December 2004; R. at 308–four-day admission in June 2005; and R. at 422–three-day admission in March 2005).)  Plaintiff's citation to record evidence after her alleged onset likewise fails to support a finding that she experienced repeated episodes of decompensation, each of extended duration.  Instead, this evidence reflects that she required in-person treatment during this time period just once and lasting only three days.  (*See* R. at 597 (reflecting admission for three days in June 2008).)  The remainder of the record citations relied upon reflect various assessments, evaluations, or treatment notes reflecting Plaintiff's self-reported symptoms.  (*See* Pl.'s Statement of Errors 14, ECF No. 13 (citing R. at 519–November 2007 diagnostic assessment; R. at 542–43–December 2007 evaluation; R. at 630–July 2008 evaluation; R. at 672–August 2009 evaluation; R. at 733-34–treatment notes reflecting Plaintiff's self-reported symptoms from one visit in December 2009 and two visits in February 2010; and R. at 744-45–May 2010 assessment).)  Notably, no treating source opined that Plaintiff had experienced any periods of decompensation of extended duration.  Further, Drs. Waddell and Hoyle, who had the benefit of reviewing the file, determined that Plaintiff had not experienced any episodes of decompensation of extended duration.

21

In sum, the Undersigned finds no error with the ALJ's determination that Plaintiff's mental impairments failed to meet or equal Listing 12.04. Accordingly, it is

**RECOMMENDED** that the Court **OVERRULE** Plaintiff's first contention of error.

**B.      RFC Determination**

Plaintiff's second contention that the ALJ erred in calculating Plaintiff's RFC is equally unavailing. A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the

> maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

Plaintiff's contention that the ALJ erred in failing to consider or accommodate her inability to sustain activity fails to persuade.  The ALJ's RFC determination accommodated each of the limitations he found credible.  He addressed both particular limitations and her medical issues as a whole as well as their effects on her ability to sustain full-time employment.[6] Moreover, the ALJ sufficiently articulated the bases for his determinations.  Plaintiff points to nothing in the record which would suggest that she would be unable to perform sustained work activities within the limitations set forth in the RFC.  Nor does she offer examples of limitations she believes the ALJ overlooked which may have better addressed the sustainability issues she alleges.

Plaintiff's assertion that the ALJ erred in relying on the outdated assessment or his own assessments likewise lacks merit.  There is no basis for concluding that the ALJ played doctor, interpreted raw medical data, or otherwise made up medical opinions in determining Plaintiff's RFC.  Rather, the Undersigned concludes that the ALJ's RFC determination is supported by substantial evidence, namely, the opinions of Drs. Waddell and Hoyle, Plaintiff's medical records, and the reports of consultative medical examiners.  Significantly, Drs. Hoyle and Waddell reviewed the file and offered their opinions well after Plaintiff alleged that she was disabled.  (R. at 566-69, 594.)  And as the Commissioner points out, Plaintiff has failed to offer

---

[6]Notably, Plaintiff has not challenged the ALJ's credibility determination.

any compelling record evidence suggesting that her condition deteriorated such that these doctors might have rendered more restrictive assessments.  *Cf. Watson v. Astrue*, No. 5:11-cv-717, 2012 WL 699788, at *5 (N.D. Ohio Mar. 1, 2012) ("If anything, the dearth of opinions cuts in the Commissioner's favor, as, in the Sixth Circuit, it is well established that . . . the claimant—and not the ALJ—has the burden to produce evidence in support of a disability claim.").  For this same reason, the Undersigned finds that the ALJ acted within the bounds of his discretion in not seeking additional evidence or and in not utilizing a medical expert at the hearing. *See Foster*,  279 F.3d at 355 ("An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary.").

In sum, the Undersigned finds no error with the ALJ's RFC determination.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's second contention of error.

## VII.    CONCLUSION

From a review of the record as a whole, the Undersigned concludes that there is substantial evidence supporting the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy.

24

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date:  July 9, 2013                                  */s/ Elizabeth A. Preston Deavers*
                                                     Elizabeth A. Preston Deavers
                                                     United States Magistrate Judge